# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| NUVASIVE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 10-849-LPS |
| | : | |
| GLOBUS MEDICAL, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Tara D. Elliot, FISH & RICHARDSON, P.C., Wilmington, DE.

Frank E. Scherkenbach, FISH & RICHARDSON, P.C., Boston, MA.
Michael J. Kane, FISH & RICHARDSON, P.C., Minneapolis, MN.
Todd G. Miller and Michael A. Amon, FISH & RICHARDSON, P.C., San Diego, CA.

    Counsel for Plaintiff.

Richard L. Horwitz and David E. Moore, POTTER ANDERSON & CORROON, LLP,
Wilmington, DE.

Vivian S. Kuo and Shane A. Nelson, WINSTON & STRAWN LLP, Houston, TX.

    Counsel for Defendant.

July 12, 2013
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff, NuVasive, Inc. ("NuVasive"), filed this patent infringement action against

Defendant, Globus Medical, Inc. ("Globus"), on October 5, 2010, alleging that Globus infringes

fifty-five claims contained in three NuVasive patents. (D.I. 1, 10, 52) On December 12, 2011,

the Court conducted a *Markman* hearing on the disputed terms. *See* Transcript ("Tr.") (D.I. 102)[1]

Below the Court rules on the parties' claim construction disputes.

## I.     BACKGROUND

### A.     The Patents-In-Suit

There are three patents-in-suit. NuVasive owns U.S. Patent No. 7,691,057 ("'057

patent"), issued on April 6, 2010; U.S. Patent No. 7,819,801 ("'801 patent"), issued on October

26, 2010; and U.S. Patent No. 7,905,840 ("'840 patent"), issued on March 15, 2011. All three

patents-in-suit are entitled, "Surgical Access System and Related Methods." The patents-in-suit

have identical "Background of the Invention" sections, similar Abstracts, and generally similar

specifications.

### B.     The Technology

Each of the patents-in-suit relates to a surgical access system and methods for performing

surgery – particularly lumbar surgery, commonly referred to as minimally invasive spinal lumbar

surgery. (D.I. 69 at 3) The patents describe the use of surgical tools to access a surgical target

site, especially the lumbar portion of the spine. ('057 patent, col. 2, lines 60-65; '801 patent, col.

2, lines 45-54; '840 patent, col. 6, lines 25-30) In such a procedure, the patient may be

---

[1]On November 3, 2011, the Court ordered NuVasive to reduce the number of asserted
claims from 55 to 15 and further ordered the parties to reduce the number of proposed claim
terms to be construed at this point in the case to no more than 15. (D.I. 88 at 18-19)

1

positioned laterally, allowing the surgical target site to be accessed through an operative corridor created in the patient's side. (*See* '840 patent Fig. 23) The operative corridor provides the surgeon access through nerve-rich tissue. Hence, the systems and methods of the patents-in-suit allow for the use of neuromonitoring to help the surgeon identify and avoid motor nerves in tissues such as the psoas muscle. (D.I. 69 at 6)[2]

## II.    LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent presents a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321

---

[2]In understanding the technology, the Court has been assisted by the parties' submissions of video tutorials. (D.I. 67, 68) However, the Court agrees with Globus that large portions of NuVasive's tutorial – such as those portions consisting of patient testimonials, allegations of copying, and extensive demonstrations of NuVasive's commercial products – are unhelpful and improper in a tutorial. (D.I. 82)

2

(internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

"Differences among claims can also be a useful guide. . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481

3

F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court may also rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the Court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. Overall, while extrinsic evidence "may be useful" to the Court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct

4

interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## III.   SANCTIONS

Nuvasive's position is that none of the terms in any of the three patents-in-suit requires

construction. In pursuing this position, NuVasive filed an opening claim construction brief that

did not address any of the parties' claim construction disputes, beyond merely identifying where

in the claims the disputed terms could be found. NuVasive's opening claim construction brief

did not provide any support (beyond conclusory rhetoric) for its position that no construction of

any disputed term was necessary. Nor did NuVasive's opening brief provide criticism of Globus'

proposed constructions – even though NuVasive knew Globus' proposed constructions and knew

the evidence Globus would rely on in support of them. In fact, NuVasive's opening brief failed

to cite even once to the specification of any of the three patents-in-suit.

Instead, NuVasive's approach, by its own description, was as follows:

> Because the source of many of Globus' proposed constructions is
> not entirely clear (Globus cited to entire office actions and
> responses thereto in the file histories), *NuVasive will not present
> its arguments against Globus' proposed constructions in this
> opening brief*. Given that there are no claim construction
> arguments in this opening brief, *there should be nothing for
> Globus to respond to in its responsive brief*. Rather than
> presenting arguments about terms for which Globus may ultimately
> not seek construction or responding to arguments that Globus may
> ultimately decide not to make, NuVasive presents in this opening
> brief a discussion of the technology at issue, a discussion of the
> applicable law of claim construction and a recitation of
> representative claims at issue that include all of the terms for which
> Globus currently seeks construction. *NuVasive submits that
> simply reading these claims provides strong support for its
> position that construction is unnecessary*.

(D.I. 69 at 1-2) (emphasis added)  This approach to claim construction was entirely unhelpful to

5

the Court and prejudicial to Globus, which only first had an opportunity to consider NuVasive's arguments against Globus' proposed constructions after reviewing NuVasive's answering brief.

Consequently, the Court found it necessary following the *Markman* hearing to provide NuVasive an opportunity to propose alternative constructions for the 15 claim terms that were the subject of the claim construction process. (D.I. 95)[3] NuVasive complied with the Court's order by providing alternative constructions while preserving its preferred position that "these terms do not need to be redefined by the Court." (D.I. 97 at 2) Globus responded. (D.I. 98) The Court also directed the parties to brief an Order to Show Cause why NuVasive should not be sanctioned for its handling of the claim construction process.[4]

Having considered all of these materials, the Court has determined that sanctions are not warranted. The post-hearing submissions have adequately remedied the prejudice to Globus (and the Court) from NuVasive's conduct. The Court has not found that NuVasive acted in bad faith. While the extra expenditures of money and time necessitated by NuVasive's conduct are unfortunate, no additional sanctions will be imposed.

\* \* \*

---

[3]Specifically, on December 13, 2011, the day after the *Markman* hearing, the Court entered an Order as follows: "To the extent that NuVasive seeks the opportunity to present alternative proposed constructions of any or all of the claim terms in dispute – while preserving its primary contention that the 'ordinary and customary' meaning should apply – NuVasive may present such alternative constructions according to the following schedule." (D.I. 95) The Order further provided that NuVasive had three days to submit a three-page letter "setting out its proposed alternative constructions and support for them." (*Id.*) Thereafter, Globus was given two weeks to respond with a letter brief of up to six pages.

[4]The same December 13, 2011 Order further directed NuVasive to "show cause as to why it should not be sanctioned for its conduct in connection with preparation of the Joint Claim Construction Chart and its claim construction briefing." (D.I. 95 at 1-2) The Order set out a briefing schedule to address the possibility of sanctions.

Before turning to the substance of the claim construction disputes, the Court deems it appropriate to elaborate on what it has found troubling about NuVasive's approach to the claim construction process, and particularly its opening brief.

Fundamentally, NuVasive had an obligation to assist the Court in resolving the parties' claim construction disputes. Perhaps the situation presented here was so unusual as to warrant a departure from the Court's ordinary practices, which include preparation of a Joint Claim Construction Chart, identifying disputed terms as well as both sides' proposed constructions and support for them; and simultaneous opening and responsive briefs, each containing argument supportive of a party's own positions and critical of those of the opposing party. If so, it was incumbent on the parties – and most especially NuVasive, as it evidently knew for quite a while that it did not believe any terms needed to be construed – to inform the Court and to propose appropriate modifications. It was not appropriate for NuVasive singlehandedly to determine that, in this case, the claim construction disputes were so simple that the Court would not require the full and informed assistance of both parties.[5]

_____

[5]In opposing sanctions, NuVasive writes:

> However, unlike the typical claim construction disputes where determining the appropriate meaning of claim terms is challenging due to the complexity of the technology and/or the nuances of the claim language, specification or prosecution history, this case presented none of those issues. Instead, the claims of the patents-in-suit use readily understood, non-technical words, and there is nothing in the way of lexicography or disclaimer about which the parties could legitimately debate.

(D.I. 99 at 11) The Court has not found the claim construction disputes presented here to be nearly as easy as NuVasive suggests. Indeed, the Court agrees with Globus that "many of the disputed terms are technical and not easily understood by the jury." (D.I. 72 at 1)

7

In short, the Court agrees with Globus that "NuVasive's Initial Brief was woefully insufficient and unproductive." (D.I. 103 at 11) While NuVasive's conduct is not sanctionable, neither is it laudable, and it has resulted in making the Court's always difficult task of construing disputed claim terms even more challenging.

## III.   CONSTRUCTION OF DISPUTED TERMS

In setting out the parties' positions and the Court's resolution of their disputes, the Court indicates as the "Plaintiff's Proposed Construction" both NuVasive's preferred position – that each term be given its "ordinary and customary meaning" – and, where NuVasive has stated one, NuVasive's less preferred alternative proposed construction. Given the Court's Order (D.I. 95), and consistent with the Court's decision not to sanction NuVasive, the Court does not agree with Globus that NuVasive's alternative constructions are "improper." (D.I. 98 at 1)[6]

---

[6]The Court does, however, agree with this statement from Globus:

> There is no reason why NuVasive could not have submitted these proposed constructions earlier in the claim construction process. NuVasive's "hide-the-ball" tactics precluded the parties' ability to engage in a meaningful meet and confer, brief the real issues in dispute, and present the Court with pertinent argument, evidence, and authority on those issues. Besides frustrating the claim construction process, NuVasive has also wasted the parties' and the Court's resources, including the present briefing, on issues that should and easily could have been submitted months ago, consistent with the Court's Scheduling Order.

(D.I. 98 at 1 n.1)

8

## A. "handle assembly"[7]

> Plaintiff's Proposed Construction: ordinary and customary meaning or
> alternatively "an assembly that may be grasped" ('801 patent) or "linkage
> assembly" ('057 patent)

> Defendant's Proposed Construction: "components to be grasped
> and held for manipulation by the hand"

> Court's Construction: "an assembly that may be grasped by hand"[8]

The primary point of disagreement between the parties with respect to the "handle

assembly" term is whether the handle assembly *must* be grasped and handled such that it can be

used to do something, as proposed by Globus, or rather, as argued by NuVasive, the handle

assembly need only be *capable of* doing so. (Tr. at 53) The Court agrees with NuVasive that the

handle assembly must be capable of being grasped. The Court also believes it appropriate to

clarify for the jury that the capability of being grasped must include the capability of being

grasped *by hand*.

Claim 1 of the '801 patent states that the handle assembly "pivots . . . in response to

*manual* adjustment of a component of the handle assembly" (emphasis added). Claim 17 of the

'057 patent adds that the handle assembly is "capable of moving" and that the handle assembly is

used "to move." It is evident from the claims that the "manual adjustment" and "moving" must

---

[7]The term appears in claim 1 of the '801 patent and claim 17 of the'057 patent.

[8]The parties have a dispute as to the proper construction of "handle assembly" and that
dispute appears to be material to issues in this case. Accordingly, the Court concludes it has an
obligation to resolve this claim construction dispute. *See 02 Micro Intern. Ltd. v. Beyond
Innovation Tech. Co., Ltd.,* 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an
actual dispute regarding the proper scope of the claims, the court, not the jury, must resolve that
dispute."). The Court has reached the same conclusion for each of the terms put in dispute by
Globus.

9

be capable of being done by hand.

The '801 specification discloses that a user can squeeze the ends of the handle assembly. (*See, e.g.*, '801 patent, col. 8 lines 12-20) The "squeezing motion" causes the retractor blades to move. Figures in the specifications – such as Figure 6 of '057 patent and Figure 11 of the '801 patent – depict embodiments of the claims that may be grasped by hand.

The Court agrees with Globus that additional support for including a reference to "the hand" in the proper construction of "handle assembly" is found in both the prosecution history and Webster's Third New International Dictionary (defining "handle" as "a part that is designed esp. to be grasped by hand or that may be grasped by hand").

The Court will not inject the words "held for manipulation" into the construction because doing so would improperly import limitations from the specification into the claims. The specification reads: "[b]y way of *example only* . . . the handle assembly *may be* manipulated to open the retractor assembly." ('801 patent, col. 13 lines 35-40) (emphasis added); *see also id.* col. 3 lines 30-37, col. 5 lines 45-56, col. 6 lines 46-54) This exemplary language does not appear to have been intended by the patentee to limit the scope of the claims. *See generally Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 365 F.3d 1299, 1303 (Fed. Cir. 2004) (finding patentee did not evince clear intent to limit).

The Court agrees with Globus that the term "handle assembly" should be construed to have the same meaning for both patents. (*See* D.I. 98 at 3)[9]

_____

[9]The Court has considered Globus' prosecution disclaimer argument for this "handle assembly" term (as well as for other terms). Although not finding any clear and unmistakable disavowal of claim scope, *see Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1325, 1325-26 (Fed. Cir. 2006) ("[F]or prosecution disclaimer to attach . . . the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable."), the Court has

10

**B.**     **"handle assembly being capable of moving said plurality of retractor blades"**[10]

> Plaintiff's Proposed Construction: ordinary and customary meaning or alternatively "handle assembly (as construed by the Court) that is able to move the plurality of retractor blades"
>
> Defendant's Proposed Construction: "handle assembly that can simultaneously move by hand the plurality of retractor blades"
>
> Court's Construction: "an assembly that may be grasped by hand that is able to move the plurality of retractor blades"

The parties' primary dispute with respect to this term is whether both handles of the

handle assembly must move simultaneously, as Globus proposes, or need not do so (but may), as

NuVasive proposes. (*See* Tr. at 57; D.I. 99 at 3)  The Court concludes that while the blades must

be introduced into the patient's body simultaneously, it is not a requirement of the claims that the

blades – once inside the body – need to be able to move simultaneously. (*See* '057 patent claim

1) (stating that retractor blades "are deliverable to said surgical target site simultaneously"))

Globus' citations to the specification support the conclusion only that a preferred embodiment

has blades that move simultaneously. (*See*, *e.g.*, '057 patent, col. 4 lines 28-32) ("allowing the

retractor blades to separate from one another (preferably simultaneously) to create an operative

corridor to the surgical target site")  Nor does the prosecution history persuade the Court

otherwise.  While Globus emphasizes that the Examiner stated that "simultaneously introducing

---

"considered and given . . . due weight" to each of NuVasive's amendments and corresponding arguments made during prosecution, in connection with each disputed term, just as Globus has requested (*see, e.g.*, D.I. 98 at 3). *See generally Desper Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1333-36 (Fed. Cir. 1998). NuVasive agreed that it is appropriate to look at the prosecution history. (Tr. at 62)

[10]The term appears in claim 17 of the '057 patent.

11

the plurality of retractor blades" was the reason for allowance (D.I. 72 at 20), NuVasive

accurately responds that the Examiner was silent as to whether the blades move simultaneously.

(D.I. 85 at 11) The Court will adopt NuVasive's alternative proposal.

## C. "pivoting said first and second pivotable arm members relative to one another"[11]

Plaintiff's Proposed Construction: ordinary and customary meaning or alternatively "capable of moving the first pivotable arm member to pivot relative to the second pivotable arm member, and moving the second pivotable arm member to pivot relative to the first pivotable arm member"

Defendant's Proposed Construction: "turning or rotating the first and second pivotable arm members against each other about a point."

Court's Construction: "capable of moving the first pivotable arm member to pivot relative to the second pivotable arm member, and moving the second pivotable arm member to pivot relative to the first pivotable arm member"

To the extent the parties' dispute relates to whether the blades must turn simultaneously,

the Court reaches the same conclusion as it did with respect to the preceding term. Globus'

construction is further problematic because it would rewrite, without basis, "pivoting" as

"turning or rotating" and replace the claim language "relative to one another" with "against each

other about a point." Globus' citation to a Webster's dictionary definition and a purported

disavowal of claim scope during prosecution are unpersuasive. (D.I. 72 at 16) The Court

concludes that the parties' dispute as to the scope of this claim term is resolved by adoption of

NuVasive's alternative proposed construction.

---

[11]The term appears in claim 1 of the '801 patent.

**D.     "actuating"**[12]

> Plaintiff's Proposed Construction: ordinary and customary meaning or
> alternatively "operating"
>
> Defendant's Proposed Construction: "squeezing by hands"
>
> Court's Construction: "operating"

The parties' dispute over this term somewhat repeats their dispute with respect to the

prior ("pivoting") term, in that Globus would require "simultaneous" movement of the blades

while NuVasive would not. For the same reasons already given, the Court agrees with NuVasive

that simultaneous movement of the blades is not required.

Additionally, Globus' construction employs the word "squeezing," yet no form of the

word "squeeze" appears in the '057 patent. (Tr. at 72)[13]  The Court finds no basis to write the

word "squeeze" into "actuating." To the contrary, the Court agrees with NuVasive that to adopt

Globus' construction would improperly limit a claim of the '057 patent to a preferred

embodiment of the '801 patent. NuVasive's alternative construction properly resolves the

parties' dispute.

**E.     "coupled"/"coupling"**[14]

> Plaintiff's Proposed Construction: ordinary and customary meaning or
> alternatively "linked"/"linking"
>
> Defendant's Proposed Construction: "connected"/ "connecting"
>
> Court's Construction: "directly connected/directly connecting"

---

[12]The term appears in claim 17 of the '057 patent.

[13]"Squeeze" and "squeezing" are used in the '801 patent. (Tr. at 56)

[14]The terms appear in claims 17 and 24 of the '057 patent.

13

These terms relate to the structure of the retractor and retractor blades, as used in claims

17 and 24 of the '057 patent. The issue is whether there needs to be a direct connection, as

Globus contends. The Court agrees with Globus that there must be such a connection.

At the hearing, NuVasive stated that "coupled" does "encompass direct attachment where

the blades and the arm portions of the retractor frame are touching" and indicated it could accept

(but does not prefer) "directly coupled." (Tr. 82-83) Generally, the claims of the '057 patent

appear to use the term "coupled" to describe elements that are directly, physically connected.

(*See* '057 patent claims 1, 5, 10, 17) Hence, the Court will adopt Globus' proposed construction.

**F.     "rigidly coupled"**[15]

> Plaintiff's Proposed Construction: ordinary and customary meaning or
> alternatively "firmly linked"
>
> Defendant's Proposed Construction: "fixed and immovably connected."
>
> Court's Construction: "fixed and immovably connected"

The dispute here is whether "rigidly coupled" requires coupling that is "fixed" and

"immovable" or instead only requires coupling that is "firm" or "stiff." (D.I. 99 at 5)

As Globus observes, both the '057 and '801 patents claim "coupled" retractor blades.

(D.I. 72 at 18) Unlike the '057 patent, the '801 patent also includes claims containing the

limitation "rigidly coupled." During prosecution of the '801 patent, NuVasive added "rigidly

coupled" to claim 1 in an effort to distinguish prior art. (D.I. 73 Ex. 22, 12/28/07 ROA at p. 2)

Under the circumstances, "rigidly coupled" must mean something different that "coupled." (D.I.

99 at 5; Tr. at 77, 80, 87) The Court concludes that its meaning, in the context of the '801 patent,

---

[15]The term appears in claim 1 of the '801 patent.

is that a "fixed and immovable connection" is required.

Here (as with most other terms in dispute) Globus relies on a disclaimer argument (*see* Tr. at 77-79), contending that "NuVasive expressly elected claims that are directed to blades that are 'rigidly attached,' not to retractor blades that are 'releasably coupled.'" The Court is unpersuaded by Globus' disclaimer argument, for reasons including that the patentee, in distinguishing the Koros reference, emphasized that the current invention is different because Koros does not teach "rigid[] coupling . . . *prior to introduction into the surgical target site*," the emphasis suggesting at least ambiguity as to whether Koros was being distinguished on the grounds Globus argues. (*See* Tr. at 86-87; D.I. 73-22 at 1798) Still, this prosecution history provides some support to Globus' proposed construction and is a reason the Court will adopt Globus' proposal.

## G.    "being positioned to abut one another and form a closed perimeter"[16]

> Plaintiff's Proposed Construction: ordinary and customary meaning or alternatively "being positioned such that each blade touches the adjacent blade(s) at one or more points to form an enclosed region"
>
> Defendant's Proposed Construction: "being positioned whereby each edge of the plurality of retractor blades is positioned to touch an adjacent blade along the entire edge to form an entirely encircled perimeter without gaps"
>
> Court's Construction: "being positioned such that each blade touches the adjacent blade(s) at one or more points to form an enclosed region"

The parties' primary dispute with respect to this term is over the meaning of "abut."

Globus argues that "abut" requires the retractor blades to touch adjacently along the entire edge to form an entirely encircled perimeter without gaps. (D.I. 72 at 19) NuVasive counters that

---

[16]The term appears in claim 17 of the '057 patent.

claim 17 does not require the blades to make contact along the entire edge but that, instead, a closed perimeter can be formed by a single point of contact between the retractor blades. (D.I. 85 at 21) The Court agrees with NuVasive.[17]

The specification teaches that the retractor blades may be positioned so that they are "generally abutting" one another. ('057 patent, col. 10 lines 3-41) "[G]enerally abutting" indicates that the patentee did not intend to import into the claims a restrictive requirement that the blades must be "positioned to touch an adjacent blade along the entire edge to form an entirely encircled perimeter without gaps."

Globus points to Figure 6 of the '057 patent, which does show blades touching at more than one point. (Tr. at 90-91) But this figure depicts a preferred embodiment. Globus' arguments for limiting the claim to this preferred embodiment are unavailing. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[P]atent coverage is not necessarily limited to inventions that look like the ones in the figures . . . . To hold otherwise would be to import limitations onto the claim from the specification, which is fraught with danger.'"). The Court is likewise unpersuaded by Globus' argument to limit claim scope because of what is described in passing in the specification as "the present invention" (in a "Brief Description of the Drawings") (*see* '057 patent, col. 5 lines 62-67)

The Court will adopt NuVasive's alternative proposed construction.[18]

---

[17]NuVasive concedes "a limited disclaimer during prosecution when [the patentee] changed the term 'generally adjacent' to 'abut one another and form a closed perimeter,'" such that "the blades have to touch." (Tr. at 108)

[18]At the hearing, NuVasive appeared to concede that all three of the blades must touch at least at one point. (Tr. at 108-10) While Globus expresses concern that in its proposed alternative NuVasive "appears to backtrack and suggest that each blade needs to touch *only one*

16

**H.     "closed position"**[19]

> Plaintiff's Proposed Construction: ordinary and customary meaning or
> alternatively "position where each blade has at least one point of contact with the
> adjacent two blades"

> Defendant's Proposed Construction: "a position whereby each edge of the
> plurality of retractor blades is positioned to touch an adjacent blade along the
> entire edge to form an entirely encircled perimeter without gaps"

> Court's Construction: "position where each blade has at least one point of contact
> with the adjacent two blades"

The parties' dispute is essentially the same dispute as has already been resolved with

respect to the preceding "being position to abut one another and form a closed perimeter" term.

For the same reasons, the Court agrees with NuVasive and will adopt its alternative proposed

construction.

**I.     "open position"**[20]

> Plaintiff's Proposed Construction: ordinary and customary meaning or
> alternatively "a position characterized by said plurality of retractor blades being
> positioned generally away from one another and forming an open perimeter"

> Defendant's Proposed Construction: the term is indefinite

> Court's Construction: "a position characterized by said plurality of retractor
> blades being positioned generally away from one another and forming an open
> perimeter"

Globus contends the term "open position" is indefinite. Globus has not demonstrated by

clear and convincing evidence that this claim term is insolubly ambiguous, such that it is

———————————

adjacent blade at one or more points" (D.I. 99 at 5), the Court does not understand NuVasive's
alternative to withdraw from NuVasive's earlier concession.

[19]The term appears in claim 1 of the '801 patent.

[20]The term appears in claim 17 of the '057 patent.

incapable of construction. *See generally Halliburton Energy Servs. v. M-1 LLC,* 514 F.3d 1244, 1249-1250 (Fed. Cir. 2008) (describing indefiniteness as "exacting standard," which is satisfied when claim term is "completely dependent on a person's subjective opinion"); *Exxon Res. & Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."). NuVasive's alternative is consistent with how a person of ordinary skill in the art would understand the ordinary and customary meaning of "open position" in the context of the '057 patent.

**J.    "being positioned generally away from one another and forming an open perimeter"**[21]

> Plaintiff's Proposed Construction: ordinary and customary meaning or alternatively "the blades are separated from one another to form an open perimeter"
>
> Defendant's Proposed Construction: the term is indefinite
>
> Court's Construction: "the blades are separated from one another to form an open perimeter"

Globus has failed to prove by clear and convincing evidence this term is indefinite. This term presents essentially the same issues as the preceding term ("open position"). For the same reasons, the Court adopts NuVasive's alternative proposed construction.

---

[21]The term appears in claim 17 of the '057 patent.

18

**K.    "opened"**[22]

> Plaintiff's Proposed Construction: ordinary and customary meaning or "the blades are moved from the closed position"
>
> Defendant's Proposed Construction: "positioned away from one another."
>
> Court's Construction: "the blades are moved from the closed position"

This is largely the same dispute as already addressed above. Claim 1 of the '801 patent

indicates that the retractor blades are "opened" when the first and second pivotable arm members

are pivoted relative to one another. For largely the same reasons as given with respect to "closed

position" and "being positioned generally away from one another and forming an open

perimeter," the Court will adopt NuVasive's alternative proposed construction.

**L.    "groove"**[23]

> Plaintiff's Proposed Construction: ordinary and customary meaning or alternatively "channel or slot in the surface of the blade having a width less than the width of the blade"
>
> Defendant's Proposed Construction: "long narrow cut or indentation in the surface of the retractor blade"
>
> Court's Construction: "channel or slot in the surface of the blade having a width less than the width of the blade"

Globus contends that the "inherent" meaning of "groove" is a cut or indentation that is

"long and narrow." (Tr. at 103-04) NuVasive contends that the inherent (or ordinary and

customary) meaning of "groove" does not require long and narrow cuts. (Tr. at 117) The Court

does not share NuVasive's confidence that, without construction, the jury will know which side's

---

[22]The term appears in claim 1 of the '801 patent.

[23]The term appears in claim 1 of the '801 patent.

19

conflicting "inherent meaning" is the correct one in the context of the patent-in-suit. (Tr. at 118) *See generally Power-One, Inc. v. Artesyn Technologies, Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.") (internal quotation marks omitted).

Thus, the Court will resolve the parties' dispute as to the scope of the claim by construing "groove." The Court concludes that the term "groove" is used in the ordinary and customary manner that one having ordinary skill in the art would understand when reviewing the '801 patent, a meaning which is captured by NuVasive's alternative proposed construction. By contrast, it appears that Globus' proposed construction might exclude certain embodiments claimed in the '801 patent (*see, e.g.*, claims 1, 17, 19, and 21).

## M. "neuromonitoring"/"nerve monitoring"[24]

> Plaintiff's Proposed Construction: ordinary and customary meaning or alternatively "monitoring the patient to determine the presence of (and optionally, the proximity and/or direction to) neural structures associated with the approach to the surgical site by providing a stimulation signal that is capable of innervating neuromuscular structures"
>
> Defendant's Proposed Construction: "monitoring the patient to determine the existence of neural structures to the surgical target site by providing a stimulation signal that is capable of innervating neuromuscular structures"
>
> Court's Construction: "monitoring the patient to determine the presence of (and optionally, the proximity and/or direction to) neural structures associated with the approach to the surgical site by providing a stimulation signal that is capable of innervating neuromuscular structures"

The parties agree that "nerve monitoring" means "neuromonitoring," but they dispute the

---

[24]The term appears in claim 19 of the '057 patent.

20

meaning of neuromonitoring. (D.I. 72 at 27) The parties' proposed constructions for this term are similar but NuVasive adds "presence of and/or optionally the proximity and/or direction to neural structures." (Tr. at 119) Globus argues that this additional language is improper because it "relates only to a 'monitoring system' or a 'surgical access system' and not to 'neuromonitoring' by itself." (D.I. 98) However, the Court agrees with NuVasive that, in the context of the patent-in-suit, the term "neuromonitoring" does require such a system. NuVasive derived its additional language from the "Summary of the Invention" section of the '057 patent and discussion of a preferred embodiment. (*See* '057 patent, col. 2 line 61 to col. 3 line 1, col. 7 lines 15-21, col. 8 lines 8-25, col. 12 lines 36-41) The Court will adopt NuVasive's alternative proposal.

**N.    "trans-psoas"**[25]

> Plaintiff's Proposed Construction: ordinary and customary meaning
>
> Defendant's Proposed Construction: "through the psoas"
>
> Court's Construction: "through the psoas"

At the *Markman* hearing, the parties advised the Court they were both agreeable to Globus' proposed construction. (Tr. at 115; *see also* D.I. 97 at 3) Accordingly, "trans-psoas" will be construed to mean "through the psoas."

---

[25]The term appears in claims 17, 26, and 27 of the '057 patent and claims 1 and 2 of the '801 patent.

21

**O.    "using [at least one] stimulation electrode"**[26]

>   Plaintiff's Proposed Construction: ordinary and customary meaning

>   Defendant's Proposed Construction: "emitting an electrical stimulation signal
>   through [at least one/a] stimulation electrode"

>   Court's Construction: "emitting an electrical stimulation signal through [at least
>   one/a] stimulation electrode"

At the *Markman* hearing, the parties advised the Court they were both agreeable to

Globus' proposed construction. (Tr. at 118-19) The Court agrees with the parties that the "user"

does not emit the electrical stimulation signal. Accordingly, "using [at least one] stimulation

electrode" shall be construed to mean "emitting an electrical stimulation signal through [at least

one/a] stimulation electrode."

## IV.    CONCLUSION

An appropriate Order will be entered.

_____

[26]The term appears in claims 1 and 13 of the '840 patent.